1  ANDREW T. KUGLER (SBN 192791)
   *akugler@mayerbrown.com*
2  Mayer Brown LLP
   350 South Grand Avenue, 25th Floor
3  Los Angeles, California  90071-1503
   Telephone:   (213) 229-9500
4  Facsimile:    (213) 625-0248

5  Attorneys for Plaintiff COMMUNITY
   REDEVELOPMENT ASSOCIATION LLC,
6  dba LIBERTY MEDIA GROUP

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

| 11 | COMMUNITY REDEVELOPMENT ASSOCIATION, LLC, a California limited liability company doing business as LIBERTY MEDIA GROUP, | Case No. CV-08-07584 ABC (JWJx) |
|---|---|---|
| 14 | Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SECOND PRELIMINARY INJUNCTION ORDER AND TO AMEND FIRST PRELIMINARY INJUNCTION ORDER** |
| 15 | v. | |
| 16 | CITY OF LOS ANGELES, a California charter city, | Date:     August 17, 2009 |
| 17 | | Time:     10:00 a.m. |
| | Defendant. | Place:     Courtroom 680 |
| 18 | | **Judge:    Hon. Audrey B. Collins** |

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SECOND PRELIMINARY INJUNCTION
ORDER AND TO AMEND FIRST PRELIMINARY INJUNCTION ORDER – CV-08-07584 ABC (JWJx)

28806198.1

1        Pursuant to Rule 201(b) of the Federal Rules of Evidence, plaintiff

2   Community Redevelopment Association, LLC, dba Liberty Media Group

3   ("Plaintiff") requests that this Court take judicial notice of the following

4   documents:

5        1)    Ordinance No. 180445 (the "ICO"), enacted by the Los Angeles City

6   Council on December 17, 2008 (attached hereto as Exhibit A).

7        2)    Resolution of the Los Angeles City Council enacted on February 20,

8   2009, extending the ICO until May 10, 2009 (attached hereto as Exhibit B).

9        3)    Resolution of the Los Angeles City Council enacted on April 22, 2009,

10   extending the ICO until June 24, 2009 (attached hereto as Exhibit C).

11        4)    Ordinance No. 180745, enacted by the Los Angeles City Council on

12   June 16, 2009 (attached hereto as Exhibit D).

13        5)    California Government Code § 65858 (attached hereto as Exhibit E).

14        6)    California Assembly Committee on Housing and Community

15   Development, Bill Analysis of SB 1098, dated June 27, 2001 (attached hereto as

16   Exhibit F).

17        7)    California Assembly Committee on Local Government, Bill Analysis

18   of SB 1098, dated June 28, 2001 (attached hereto as Exhibit G).

19        8)    California State Senate Bill Analysis, Senate Third Reading of SB

20   1098 (attached hereto as Exhibit H).

21        These documents are subject to judicial notice pursuant to Federal Rule of

22   Evidence 201(b), which provides that a court may take judicial notice of facts that

23   are "either (1) generally known within the territorial jurisdiction of the trial court or

24   (2) capable of accurate and ready determination by resort to sources whose

25   accuracy cannot reasonably be questioned."   Fed. R. of Evid. 201(b).   These

26   documents are further subject to judicial notice under Rule 201(b) as a government

27   document.  Johnson v. Morgenthau, 160 F.3d 897, 898 (2d Cir. 1998); Joseph v.

28

U.S. Civil Service Comm'n., 554 F.2d 1140, 1147 n.12 (D.C. Cir. 1977).   This request is made in support of Liberty Media's Motion for Preliminary Injunction, which is being filed concurrently herewith.

Dated:  July 27, 2009                          MAYER BROWN LLP


                                               By: /S/ Andrew T. Kugler
                                                    Andrew T. Kugler
                                               Attorneys for Plaintiff COMMUNITY
                                               REDEVELOPMENT ASSOCIATION,
                                               LLC, DBA LIBERTY MEDIA GROUP

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SECOND PRELIMINARY INJUNCTION ORDER AND TO AMEND FIRST PRELIMINARY INJUNCTION ORDER – CV-08-07584 ABC (JWJx)

28806198.1

# EXHIBIT A

ORDINANCE NO. ___180445___

An ordinance imposing interim regulations on the issuance of building permits for
Off-Site Signs, including Digital Displays, and new Supergraphic Signs.

**WHEREAS,** on April 17, 2002, the City Council adopted Ordinance No. 174517
to ban the erection of new Supergraphic Signs; and

**WHEREAS,** on April 30, 2002, the City Council adopted Ordinance No. 174547
to ban the alteration of existing Off-Site Signs; and

**WHEREAS,** in 2006 and 2007 the City entered into settlement agreements with
off-site advertising companies Regency, Clear Channel and CBS who challenged the
City's sign ordinance and inspection program.  A term of the settlement agreements
allowed these companies to modernize a certain number of existing conventional signs
to digital signs.

**WHEREAS,** other lawsuits challenging the City's ban on Off-Site Signs and
Supergraphic Signs continue to be litigated in both federal and state court; and

**WHEREAS,** on August 26, 2008, in one of the cases, *World Wide Rush v. City of
Los Angeles,* the Court granted a permanent injunction against the City's enforcement
of the ban as to World Wide Rush's signs on the basis that the exceptions to the City's
ban on Supergraphic Signs and Off-Site Signs granted the City too much discretion to
approve or deny signs based on the content of the sign, or the identity of the speaker;
and

**WHEREAS,** on September 9, 2008, PLUM held a hearing on a motion to "revise
the sign ordinance to toughen and create easily enforceable time/place/manner
restrictions citywide to protect neighborhoods."  At that time members of the public
testified about the negative effects of Off-Site Sign Digital Displays and Supergraphic
Signs.  In response, PLUM referred the motion to appropriate city staff to revise the
citywide sign regulations; and

**WHEREAS,** on December 2, 2008, the Planning Department reported to PLUM
that it would have a draft of the new permanent time, place and manner regulations to
the City Planning Commission for their review and recommendation on January 22,
2009; and

**WHEREAS,** the court's ruling in *World Wide Rush* has triggered a proliferation of
new Supergraphic Signs and there is a probability that the ruling will also result in new
Off-Site Signs, including Digital Displays, while the City undertakes a comprehensive
review of the existing sign ordinance and formulates recommendations for updating the
ordinance; and

1

EXHIBIT A

**WHEREAS,** the companies that settled with the City are in the process of converting existing conventional Off-Site Signs to Digital Displays and because no existing City regulations address where and how these conversions can take place, some of the signs being converted to Digital Displays are causing unanticipated negative impacts including negative impacts on residential neighborhoods; and

**WHEREAS,** in addition to the conversion of existing Off-Site Signs to Digital Displays, new Off-Site Signs, some with Digital Displays, might be erected; and

**WHEREAS,** it is necessary to halt the proliferation of new Off-Site Signs, including Digital Displays, and Supergraphic Signs, until permanent regulations can be enacted and put into place so the adverse effects of these new or modified signs can be minimized or eliminated; and

**WHEREAS,** the City Council has determined that in order to address these concerns, it is necessary and appropriate that an interim control ordinance be enacted prohibiting the issuance of permits for new Off-Site Signs, including Digital Displays, and Supergraphic Signs.

**NOW THEREFORE,**

**THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:**

Section 1.  **DEFINITIONS.**  The following words or phases, whenever used in this ordinance, shall be construed as defined in this section.  Words and phrases not defined here shall be construed as defined in Sections 12.03 and 14.4.2 of the Los Angeles Municipal Code (LAMC).

**DIGITAL DISPLAY.**  A sign face that displays still images, scrolling images or moving images, including video and animation, that may be changed remotely through electronic means and utilizes a series of grid lights, including cathode ray, light emitting diode display (LED), plasma screen, liquid crystal display (LCD), fiber optic, or other electronic media or technology.

**SUPERGRAPHIC SIGN.**  A sign, consisting of an image projected onto a wall or printed on vinyl, mesh or other material with or without written text, supported and attached to a wall by an adhesive and/or by using stranded cable and eye bolts and/or other materials or methods, and which does not comply with the following provisions of the LAMC:  Sections 14.4.10, 14.4.16, 14.4.17, 14.4.18, and/or 14.4.20.

Sec. 2.  **PROHIBITION.**  Notwithstanding any provision of the LAMC to the contrary, including Section 12.26 A 3, or any other ordinances adopted by the City Council containing regulations regarding signs, for a period of 90 days from the effective date of this ordinance, or until a permanent ordinance which amends the citywide

provisions governing Off-Site Signs, including Digital Displays and Supergraphic Signs
becomes effective, whichever occurs first:

A.  No building permit for an Off-Site Sign, including any Off-Site Digital Display or new
Supergraphic Sign shall be issued.

B.  No person shall erect, place, alter or construct any Off-Site Sign, including any Off-
Site Digital Display or Supergraphic Sign pursuant to a building permit issued prior to
the effective date of this ordinance.

>    Sec. 3.  **EXCEPTIONS**.

A.  The prohibitions specified in Section 2 of this ordinance shall not apply to any
construction for which a building permit is required as follows:

> 1.  In order to comply with an order issued by the Department of Building and
> Safety to repair, remove, or demolish an unsafe or a substandard condition with
> respect to any existing Off-Site Sign, including a Digital Display.

> 2.  In order to replace an Off-Site Sign, including a Digital Display damaged as a
> result of fire, earthquake, or other natural disaster, provided that the replacement
> is not prohibited by any provision of the LAMC.

B.  The prohibitions specified in Section 2 of this ordinance shall not apply to any
building permit issued prior to the effective date of this ordinance:

> 1.  If the building permit holder has performed substantial work on or before the
> date of adoption of this ordinance by City Council and has incurred substantial
> liabilities in good faith reliance upon the building permit.

> 2.  The work performed shall be considered substantial if construction pursuant
> to a valid building permit has progressed to the point that one of the inspections
> required by LAMC Section 91.108.5 has been made and the work for which the
> inspection was called has been approved by the Department of Building and
> Safety prior to the effective date of this ordinance.

>    Sec. 4.  **EXTENSION OF REGULATIONS.**  The City Council may by resolution,
extend the provisions of this ordinance for two additional 45-day periods, so long as the
Council makes the following findings:  That appropriate City agencies and officials are
exercising due diligence to assure that the permanent regulations are being
expeditiously processed.

>    Sec. 5.  **SEVERABILITY.**  If any provision of this ordinance is found to be
unconstitutional or otherwise invalid by any court of competent jurisdiction, that invalidity
shall not affect the remaining provisions of this ordinance which can be implemented

without the invalid provision, and, to this end, the provisions of this ordinance are declared to be severable.

Sec. 6. **APPLICABILITY OF THE ZONING CODE.** The regulations of this ordinance are in addition to those set forth in the planning and zoning provisions of Chapter 1 of the LAMC and any other ordinances adopted by the City Council, and do not contain any rights not otherwise granted under the provisions and procedures contained in that Chapter or any other ordinances.

Sec. 7. **URGENCY CLAUSE.** The City Council finds and declares that this ordinance is required for the immediate preservation of the public peace, health and safety for the following reasons. This ordinance is necessary to prevent irreversible development from occurring pending adoption of a permanent ordinance by preventing the construction and placement of signage that would add to visual blight in the City and possibly undermine the recommendations for updating the sign ordinance. Therefore, this ordinance shall become effective upon publication pursuant to Los Angeles City Charter Section 253.

Sec. 8.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that this ordinance was passed by the Council of the City of Los Angeles, **by a vote of not less than three-fourths** of all of its members, at its meeting of _____DEC 1 7 2008_____.

KAREN E. KALFAYAN, City Clerk

By _____
Deputy

Approved _____DEC 2 3 2008_____

_____
Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By_____
SHARON SIEDORF CARDENAS
Assistant City Attorney

Date _____DEC 1 7 2008_____

File No(s). CF No. 08-3422, CPC No. 2008-4482-ICO

Pursuant to Charter Section 559, I **disapprove** this ordinance on behalf of the City Planning Commission and recommend that it **not** be adopted . . . . .

December 17, 2008

See attached report

_____
S. Gail Goldberg
Director of Planning

M:\Real Prop_Env_Land Use\LAND_USE\Land Use\Sharon Cardenas\Ordinances\Off-site Digital Signs-Supergraphic ICO.doc

# EXHIBIT B



*For Tuesday, 2/24*

### RESOLUTION



FEB 2 0 2009

**WHEREAS**, on December 17, 2008 the City Council approved an Interim Control Ordinance (ICO) to prohibit new supergraphics, digital conversions, billboards and other off-site signs while the Planning Department, City Attorney, other city agencies and stakeholders develop a new sign ordinance, and

**WHEREAS**, the ICO states that it is in effect for 90 days following the effective date of the ordinance, which is December 26, 2008, and

**WHEREAS**, the current ICO will expire on March 26, 2009.  The legislative process to approve changes to the City's sign ordinances may not be completed by that time, and

**WHEREAS**, the Los Angeles City Planning Department and Planning Commission have been working diligently to craft a new sign ordinance that includes strong enforcement provisions and ensures consistency with recent judicial rulings.  On February 19, 2009 the Planning Commission created a working group to explore questions raised by various stakeholders at a public hearing and sought additional time to further refine the proposed sign ordinance, and

**WHEREAS**, to ensure that the City continues to ban new supergraphics, digital conversions, and new off-site signs while the revised sign ordinance is still pending, the City Council should extend the ICO for an additional forty-five days, and

**THEREFORE, BE IT RESOLVED** that by the adoption of this Resolution, the City Council hereby extends the provisions of Ordinance No. 180445 temporarily prohibiting the issuance of building permits for off-site signs, off-site sign digital displays, and supergraphic signs for an additional 45 days to May 10, 2009 or upon the adoption of permanent regulations.

PRESENTED BY:

_____
Councilmember Jack Weiss
5th District

_____
Councilmember Wendy Greuel
2nd District

_____
Council President Eric Garcetti
13th District

_____
Councilmember Bill Rosendahl
11th District

ORIGINAL

SECONDED BY:

_____
*For Edi P. Reyes*
*1st District*
February 20, 2009

08-3422-51

## ADOPTED

FEB 2 4 2009

**LOS ANGELES CITY COUNCIL**

# EXHIBIT C

08-3422-S2

PLANNING & LAND USE MANAGEMENT

APR 2 2 2009

## RESOLUTION

**WHEREAS,** on December 17, 2008 the City Council approved an Interim Control Ordinance (ICO) to prohibit new supergraphics, digital conversions, billboards and other off-site signs while the Planning Department, City Attorney, other city agencies and stakeholders develop a new sign ordinance, and

**WHEREAS,** the ICO states that it is in effect for 90 days following the effective date of the ordinance, which is December 26, 2008, and

**WHEREAS,** the ICO allows the Council to extend the provisions of the ordinance for two 45-day periods, so long as the Council makes the following findings: That appropriate City agencies and officials are exercising due diligence to assure that the permanent regulations are being expeditiously processed; and

**WHEREAS,** the ICO received its first extension on February 20, 2009, inasmuch as it was set to expire on March 26, 2009; and

**WHEREAS,** the current ICO will expire on May 10, 2009, and the legislative process to approve changes to the City's sign ordinances may not be completed by that time, and

**WHEREAS,** the Los Angeles City Planning Department and Planning Commission have been working diligently to craft a new sign ordinance that includes strong enforcement provisions and ensures consistency with recent judicial rulings, and on February 19, 2009 the Planning Commission created a working group to explore questions raised by various stakeholders at a public hearing and sought additional time to further refine the proposed sign ordinance, and

**WHEREAS,** to ensure that the City continues to ban new supergraphics, digital conversions, and new off-site signs while the revised sign ordinance is still pending, the City Council should extend the ICO for an additional forty-five days.

**NOW, THEREFORE, BE IT RESOLVED** that by the adoption of this Resolution, the City Council hereby extends the provisions of Ordinance No. 180445 temporarily prohibiting the issuance of building permits for off-site signs, off-site sign digital displays, and supergraphic signs for a second and final 45 days to June 24, 2009 or upon the adoption of permanent regulations, inasmuch as the City Planning Department is actively working towards the creation of the appropriate regulatory measures to address this issue.

PRESENTED BY

**ED P. REYES**
**Councilmember, 1st District**

SECONDED BY _E. G_

RME

Ç4

EXHIBIT C

# EXHIBIT D

ORDINANCE NO. _____180745_____

An ordinance imposing interim regulations on the issuance of building permits for Off-Site Signs, including Off-Site Digital Displays, and new Supergraphic Signs.

**WHEREAS,** on April 17, 2002, the City Council adopted Ordinance No. 174517 to ban the erection of new Supergraphic Signs; and

**WHEREAS,** on April 30, 2002, the City Council adopted Ordinance No. 174547 to ban the alteration of existing Off-Site Signs; and

**WHEREAS,** in 2006 and 2007 the City entered into settlement agreements with off-site advertising companies Regency, Clear Channel and CBS who challenged the City's sign ordinance and inspection program. A term of the settlement agreements allowed these companies to modernize a certain number of existing conventional signs to digital signs; and

**WHEREAS,** other lawsuits challenging the City's ban on Off-Site Signs and Supergraphic Signs continue to be litigated in both federal and state court; and

**WHEREAS,** on August 26, 2008, in one of the cases, *World Wide Rush v. City of Los Angeles,* the Court granted a permanent injunction against the City's enforcement of the ban on the basis that the exceptions to the City's ban on Supergraphic Signs and Off-Site Signs granted the City too much discretion to approve or deny signs based on the content of the sign, or the identity of the speaker; and

**WHEREAS,** on September 9, 2008, the City Council's Planning and Land Use Management Committee (PLUM) held a hearing on a motion to "revise the sign ordinance to toughen and create easily enforceable time/place/manner restrictions citywide to protect neighborhoods." At that time, members of the public testified about the negative effects of Off-Site Sign Digital Displays and Supergraphic Signs. In response, PLUM referred the motion to appropriate city staff to revise the citywide sign regulations; and

**WHEREAS,** on December 2, 2008, the Planning Department reported to PLUM that it would have a draft of the new permanent time, place and manner regulations to the City Planning Commission for their review and recommendation on January 22, 2009; and

**WHEREAS,** the court's ruling in *World Wide Rush* triggered a proliferation of new Supergraphic Signs and there is a probability that the ruling will also result in new Off-Site Signs, including Off-Site Digital Displays, while the City undertakes a comprehensive review of the existing sign ordinance and formulates recommendations for updating the ordinance; and

1

**WHEREAS,** the companies that settled with the City were in the process of converting existing conventional Off-Site Signs to Digital Displays and because no existing City regulations addressed where and how these conversions could take place, some of the signs being converted to Digital Displays caused unanticipated negative impacts including negative impacts on residential neighborhoods; and

**WHEREAS,** in addition to the conversion of existing Off-Site Signs to Digital Displays, new Off-Site Signs have been erected; and

**WHEREAS,** it was necessary to halt the proliferation of new Off-Site Signs, including Off-Site Digital Displays, and Supergraphic Signs, until permanent regulations can be enacted and put into place so the adverse effects of these new or modified signs can be minimized or eliminated; and

**WHEREAS,** the City Council determined that in order to address these concerns, it was necessary and appropriate that an interim control ordinance be enacted prohibiting the issuance of permits for new Off-Site Signs, including Off-Site Digital Displays, and Supergraphic Signs; and

**WHEREAS,** on December 17, 2008, the City Council adopted an interim control ordinance, Ordinance No. 180445, effective December 26, 2008, that prohibited the issuance of permits for new Off-Site Signs, including Off-Site Digital Displays, and Supergraphic Signs for 90 days, with two possible 45 day extensions; and

**WHEREAS,** the City Council extended Ordinance No. 180445 on February 24, 2009 and May 5, 2009; and

**WHEREAS,** Ordinance No. 180445 expires on June 24, 2009; and

**WHEREAS,** during the period the interim control ordinance was in effect, City Planning staff worked diligently to craft proposed new permanent sign regulations; and

**WHEREAS,** after numerous public hearings at the City's Planning Commission and the City Council's PLUM Committee, the proposed permanent regulations were first presented to the full City Council on May 26, 2009; and

**WHEREAS,** on May 26, 2009, the City Council acted to continue consideration of the permanent regulations for 90 days and adopted a motion to enact a new interim control ordinance for 90 days that will continue the prohibition of the issuance of permits for new Off-Site Signs, including Off-Site Digital Displays, and Supergraphic Signs after the expiration of Ordinance No. 180445; and

**WHEREAS,** the interim control ordinance is necessary to halt the proliferation of new Off-Site Signs, including Off-Site Digital Displays, and Supergraphic Signs, until the City Council has sufficient time to review the proposed permanent regulations.

**NOW THEREFORE,**

**THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:**

Section 1.  **DEFINITIONS.**  The following words or phases, whenever used in this ordinance, shall be construed as defined in this section.  Words and phrases not defined here shall be construed as defined in Sections 12.03 and 14.4.2 of the Los Angeles Municipal Code (LAMC).

**DIGITAL DISPLAY.**  A sign face that displays still images, scrolling images or moving images, including video and animation, that may be changed remotely through electronic means and utilizes a series of grid lights, including cathode ray, light emitting diode display (LED), plasma screen, liquid crystal display (LCD), fiber optic, or other electronic media or technology.

**SUPERGRAPHIC SIGN.**  A sign, consisting of an image projected onto a wall or printed on vinyl, mesh or other material with or without written text, supported and attached to a wall by an adhesive and/or by using stranded cable and eye bolts and/or other materials or methods, and which does not comply with the following provisions of the LAMC: Sections 14.4.10, 14.4.16, 14.4.17, 14.4.18, and/or 14.4.20.

Sec. 2.  **PROHIBITION.**  Notwithstanding any provision of the LAMC to the contrary, including Section 12.26 A 3, or any other ordinances adopted by the City Council containing regulations regarding signs, for a period of 90 days from the operative date of this ordinance, or until a permanent ordinance which amends the citywide provisions governing Off-Site Signs, including Off-Site Digital Displays, and Supergraphic Signs becomes effective, whichever occurs first:

A.  No building permit for a new Supergraphic Sign or an Off-Site Sign, including any Off-Site Digital Display, shall be issued.

B.  No person shall erect, place, alter or construct any Supergraphic Sign or Off-Site Sign, including any Off-Site Digital Display, pursuant to a building permit issued prior to the operative date of this ordinance.

C.  No person shall erect, place, alter or construct any Supergraphic Sign or Off-Site Sign, including any Off- Site Digital Display.

Sec. 3.  **EXCEPTIONS.**

A.  The prohibitions specified in Section 2 of this ordinance shall not apply to any construction for which a building permit is required as follows:

1. In order to comply with an order issued by the Department of Building and Safety to repair, remove, or demolish an unsafe or a substandard condition with respect to any existing Off-Site Sign, including an Off-Site Digital Display.

2. In order to replace an Off-Site Sign, including an Off-Site Digital Display, damaged as a result of fire, earthquake, or other natural disaster, provided that the replacement is not prohibited by any provision of the LAMC.

B.  The prohibitions specified in Section 2 of this ordinance shall not apply to any building permit issued prior to the effective date of Ordinance No. 180445:

If the Department of Building and Safety determines that both substantial liabilities have been incurred, and substantial work has been performed on site, in accordance with the terms of that permit, pursuant to Section 91.106.4.3 of the Los Angeles Municipal Code.

Sec. 4. **SEVERABILITY.**  If any provision of this ordinance is found to be unconstitutional or otherwise invalid by any court of competent jurisdiction, that invalidity shall not affect the remaining provisions of this ordinance which can be implemented without the invalid provision, and, to this end, the provisions of this ordinance are declared to be severable.

Sec. 5. **APPLICABILITY OF THE ZONING CODE.**  The regulations of this ordinance are in addition to those set forth in the planning and zoning provisions of Chapter 1 of the LAMC and any other ordinances adopted by the City Council, and do not contain any rights not otherwise granted under the provisions and procedures contained in that Chapter or any other ordinances.

Sec. 6. **ENFORCEMENT.**  Every violation of this ordinance is punishable as a misdemeanor and shall be punishable by a fine of not more than $1,000.00 or by imprisonment in the County Jail for a period of not more than six months, or by both a fine and imprisonment.  Each person shall be guilty of a separate offense for each and every day during any portion of which any violation of any provision of this ordinance is committed, continued or permitted by the person, and shall be punishable accordingly.

In addition to any other remedy or penalty, any violation of any provision of this ordinance is declared to be a public nuisance and may be abated by the City or by the City Attorney as a nuisance by means of a restraining order, injunction or any other order or judgment in law or equity issued by a court of competent jurisdiction.  Violations of this ordinance are deemed continuing violations and each day that a violation continues is deemed to be a new and separate offense and subject to a maximum civil penalty of $2,500 for each and every offense.  As part of any civil action, the court may require posting of a performance bond to ensure compliance with this Code, applicable state codes, court order or judgment.

Sec. 7.  **OPERATIVE DATE.**  The operative date of this ordinance shall be June 25, 2009.

Sec. 8.  **URGENCY CLAUSE.**  The City Council finds and declares that this ordinance is required for the immediate preservation of the public peace, health and safety for the following reasons. This ordinance is necessary to prevent irreversible development from occurring pending adoption of a permanent ordinance by preventing the construction and placement of signage that would add to visual blight in the City and possibly undermine the recommendations for updating the sign ordinance. Therefore, this ordinance shall become effective upon publication pursuant to Los Angeles City Charter Section 253.

5

Sec. 9.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that this ordinance was passed by the Council of the City of Los Angeles, **by a vote of not less than three-fourths** of all of its members, at its meeting of _____JUN 0 9 2009_____.

JUNE LAGMAY, City Clerk

By _____
                                    Deputy

Approved _____JUN 1 6 2009_____

_____
                                    Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By _____
        JERI L. BURGE
        Assistant City Attorney

Date _____

File No(s).  CF 08-2020, CPC 2009-1583-ICO

Pursuant to Charter Section 559, I approve this ordinance on behalf of the City Planning Commission and recommend that it be adopted . . . . .

June _9_, 2009

See attached report.

_____
        S. Gail Goldberg
        Director of Planning

M:\Real Prop_Env_Land Use\Land Use\Jeri Burge\Ordinances\Revisions to 2nd ICO re off-site and supergraphic signs.doc

6

# EXHIBIT E



LEXSTAT CALIFORNIA GOVERNMENT CODE 65858

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH CH. 18 OF *
THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS., EFF. 5/21/09,
CH. 25 OF THE 2009-2010 3d EX. SESS., THE GOVERNOR'S REORGANIZATION PLAN #1 OF
2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20, 2009

GOVERNMENT CODE
Title 7.  Planning and Land Use
Division 1.  Planning and Zoning
Chapter 4.  Zoning Regulations
Article 2.  Adoption of Regulations

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Gov Code § 65858* (2009)

**§ 65858.  Interim ordinance as urgency measure**

   (a) Without following the procedures otherwise required prior to the adoption of a zoning ordinance, the legislative body of a county, city, including a charter city, or city and county, to protect the public safety, health, and welfare, may adopt as an urgency measure an interim ordinance prohibiting any uses that may be in conflict with a contemplated general plan, specific plan, or zoning proposal that the legislative body, planning commission or the planning department is considering or studying or intends to study within a reasonable time. That urgency measure shall require a four-fifths vote of the legislative body for adoption. The interim ordinance shall be of no further force and effect 45 days from its date of adoption. After notice pursuant to Section 65090 and public hearing, the legislative body may extend the interim ordinance for 10 months and 15 days and subsequently extend the interim ordinance for one year. Any extension shall also require a four-fifths vote for adoption. Not more than two extensions may be adopted.

   (b) Alternatively, an interim ordinance may be adopted by a four-fifths vote following notice pursuant to Section 65090 and public hearing, in which case it shall be of no further force and effect 45 days from its date of adoption. After notice pursuant to Section 65090 and public hearing, the legislative body may by a four-fifths vote extend the interim ordinance for 22 months and 15 days.

   (c) The legislative body shall not adopt or extend any interim ordinance pursuant to this section unless the ordinance contains legislative findings that there is a current and immediate threat to the public health, safety, or welfare, and that the approval of additional subdivisions, use permits, variances, building permits, or any other applicable entitlement for use which is required in order to comply with a zoning ordinance would result in that threat to public health, safety, or welfare. In addition, any interim ordinance adopted pursuant to this section that has the effect of denying approvals needed for the development of projects with a significant component of multifamily housing may not be extended except upon written findings adopted by the legislative body, supported by substantial evidence on the

**EXHIBIT E**

Cal Gov Code § 65858

record, that all of the following conditions exist:

(1) The continued approval of the development of multifamily housing projects would have a specific, adverse impact upon the public health or safety. As used in this paragraph, a "specific, adverse impact" means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date that the ordinance is adopted by the legislative body.

(2) The interim ordinance is necessary to mitigate or avoid the specific, adverse impact identified pursuant to paragraph (1).

(3) There is no feasible alternative to satisfactorily mitigate or avoid the specific, adverse impact identified pursuant to paragraph (1) as well or better, with a less burdensome or restrictive effect, than the adoption of the proposed interim ordinance.

(d) Ten days prior to the expiration of that interim ordinance or any extension, the legislative body shall issue a written report describing the measures taken to alleviate the condition which led to the adoption of the ordinance.

(e) When an interim ordinance has been adopted, every subsequent ordinance adopted pursuant to this section, covering the whole or a part of the same property, shall automatically terminate and be of no further force or effect upon the termination of the first interim ordinance or any extension of the ordinance as provided in this section.

(f) Notwithstanding subdivision (e), upon termination of a prior interim ordinance, the legislative body may adopt another interim ordinance pursuant to this section provided that the new interim ordinance is adopted to protect the public safety, health, and welfare from an event, occurrence, or set of circumstances different from the event, occurrence, or set of circumstances that led to the adoption of the prior interim ordinance.

(g) For purposes of this section, "development of multifamily housing projects" does not include the demolition, conversion, redevelopment, or rehabilitation of multifamily housing that is affordable to lower income households, as defined in *Section 50079.5 of the Health and Safety Code*, or that will result in an increase in the price or reduction of the number of affordable units in a multifamily housing project.

(h) For purposes of this section, "projects with a significant component of multifamily housing" means projects in which multifamily housing consists of at least one-third of the total square footage of the project.

**HISTORY:**

Added Stats 1965 ch 1880 § 6. Amended Stats 1967 ch 366 § 1; Stats 1971 ch 187 § 1; Stats 1982 ch 1108 § 1; Stats 1984 ch 1009 § 24; Stats 1988 ch 1408 § 3; Stats 1992 ch 231 § 1 (AB 1262); Stats 1997 ch 129 § 1 (SB 927); Stats 2001 ch 939 § 1 (SB 1098).

**NOTES:**

**Editor's Notes**

There was another section of this number which was added Stats 1982 ch 1108 § 2, to become operative January 1, 1989, amended Stats 1984 ch 1009 § 25, and repealed Stats 1988 ch 1408 § 4.

**Amendments:**

Cal Gov Code § 65858

**1967 Amendment:**

Added (1) the sixth sentence; and (2) "any" after "When" in the seventh sentence.

**1971 Amendment:**

(1) Amended the third sentence by (a) substituting "four months" for "90 days"; (b) deleting "by a four-fifths vote" after "body may"; and (c) adding "eight months and subsequently extend such interim ordinance for"; and (2) added the fourth sentence.

**1982 Amendment:**

**(1)** Added subdivision designations (a), (b), and (e); **(2)** divided the former third sentence into the present third and fourth sentences of subd (a), and the former sixth sentence into the present two sentences of subd (b) by substituting "45 days from its date of adoption." for "four months from the date of adoption thereof; provided, however, that"; **(3)** substituted "10 months and 15 days" for "eight months" in the fourth sentence of subd (a); **(4)** substituted "22 months and 15 days" for "one year" at the end of subd (b); and **(5)** added subds (c), (d), and the last paragraph.

**1984 Amendment:**

In addition to making technical changes, **(1)** added "general plan, specific plan, or" before "zoning proposal" in the first sentence of subd (a); **(2)** substituted "Section 65090" for "Section 65856" wherever it appears in the fourth sentence of subd (a) and in subd (b); and **(3)** substituted "use permits" for "rezonings, land use permits" in subd (c).

**1988 Amendment:**

**(1)** Generally eliminated "such"; **(2)** added "interim" after "of the first" in subd (e); and **(3)** deleted the former last paragraph which read: "This section shall remain in effect only until January 1, 1989, and as of such date is repealed, unless a later enacted statute, which is chaptered before January 1, 1989, deletes or extends such date."

**1992 Amendment:**

Substituted "that" for "a" after "would result in" in subd (c).

**1997 Amendment:**

**(1)** Added the comma after "safety, health" in subd (a); **(2)** substituted "legislative findings" for "a finding" in subd (c); and **(3)** added subd (f).

**2001 Amendment:**

Cal Gov Code § 65858

(1) Amended the first sentence of subd (a) by (a) adding "of a county, city, including a charter city, or city and county"; and (b) substituting "that" for "which" after "prohibiting any uses" and after "or zoning proposal"; (2) added the introductory clause and subd (c)(1)-(c)(3) in subd (c); (3) substituted "that" for "an" after "the expiration of" in subd (d); and (4) added subds (g) and (h).

**Historical Derivation:**

Former Gov C § 65806, as added Stats 1953 ch 1355 § 3, amended Stats 1961 ch 1871 § 1.

**Note**

Stats 1997 ch 129 provides:

SEC. 2. In enacting this act to amend *Section 65858 of the Government Code* by adding a subdivision (f) to that section, it is the intent of the Legislature that an ordinance that complies with that subdivision and was in existence on or before April 14, 1997, shall not be invalidated if challenged pursuant to subdivision (e) of *Section 65858 of the Government Code.*

**Cross References:**

Adoption of county urgency ordinance taking effect immediately: *Gov C § 25123.*

Notice by publication or posting: *Gov C § 65090.*

**Collateral References:**

Cal. Forms Pleading & Practice (Matthew Bender(R)) ch 579 "Zoning And Planning".

8 Witkin Summary (10th ed) Constitutional Law § 1023.

Miller & Starr, Cal Real Estate 3d §§ 25:174, 25:179.

*Cal. Legal Forms, (Matthew Bender) § 30B.110.*

**Law Review Articles:**

Annual Review of Environmental and Natural Resources Law: Land Use Law Takings Lake Tahoe's Temporary Development Moratorium: Why a Stitch in Time Should Not Define the Property Interest in a Takings Claim. *28 Ecology LQ 39.*

**Attorney General's Opinions:**

# EXHIBIT F

SB 1098
Page A

Date of Hearing:  June 27, 2001

ASSEMBLY COMMITTEE ON HOUSING AND COMMUNITY DEVELOPMENT
Alan Lowenthal, Chair
SB 1098 (Alarcon) - As Proposed to be Amended:  June 27, 2001

SENATE VOTE  :  31 - 3

SUBJECT  :  Interim Ordinances; Housing

SUMMARY  : Makes changes in law relating to interim ordinances and
housing element law. Specifically, this bill :

1) Prohibits a city or county, including a charter city and/or
county from extending beyond 45 days, any interim ordinance
that denies approval of development of multifamily housing
unless the legislative body makes written findings, supported
by substantial evidence, that all of following exist:

a)  Approval of the project would have a significant,
quantifiable, direct and unavoidable adverse impact, based
on objective, identified written public health, or safety
standards, policies, or conditions as they existed on the
date that the ordinance was adopted.

b)  The interim ordinance is necessary to avoid the adverse
impact.

c)  There is no feasible alternative to avoid the adverse
impact.

2) Clarifies that existing law still applies to a moratorium
ordinance relating to demolition, conversion, redevelopment,
or rehabilitation of affordable multifamily housing.

3) Clarifies that local governments must identify and
appropriately zone sufficient land to meet the jurisdiction's
housing needs for all income categories and assure that the
zoning is accompanied by appropriate standards to facilitate
the development of housing for lower income as well as
moderate income households.

EXISTING LAW

1) Provides that the legislative body of a local government, in

SB 1098
Page B

order to protect the public safety, health, and welfare, may
adopt as an urgency measure, an interim ordinance that
prohibits any land use that is inconsistent with a
contemplated general plan or specific plan, or zoning proposal
that the legislative body, planning commission or planning
department is considering.  (Government Code Section 65858)

2) Requires a four-fifths vote of the legislative body to adopt
an interim ordinance. (Government Code Section 65858)

3) Requires such interim ordinances to sunset 45 days after
adoption, however it may be extended for additional periods to
a cumulative maximum duration of two years. (Government Code
Section 65858)

4) Provides that the legislative body shall not adopt an interim
ordinance unless the ordinance contains legislative findings
that there is an immediate threat to the public health,
safety, or welfare, and that the approval of a project
otherwise consistent with the zoning ordinance would result in
that threat to public health, safety or welfare.
(Government Code Section 65858)

5) Requires local governments to designate and zone sufficient
vacant land for residential use with appropriate standards, in
relation to zoning for nonresidential use, and in relation to
growth projections to meet housing needs as identified in the
general plan.
(Government Code Section 65913.1)

FISCAL EFFECT  :  None.

COMMENTS  :

Interim Ordinances

The Moratorium Power allows a local government to adopt a

**EXHIBIT F**

development "freeze" or other zone change immediately, without
following normal rezoning procedures such as preparing an
Environmental Impact Report, noticing and holding a public
hearing, adopting an ordinance over two meetings at least five
days apart, and allowing thirty days before the ordinance goes
into effect.  A developer making application one day under one
set of zoning regulations may find that the next day the rules
have changed.  It has been suggested that the Moratorium Power

                                                    SB 1098
                                                    Page C
may be used as a trump card against politically "undesirable"
land uses, such as low-income housing.<1>

According to the author of this bill: "Recently, the cities of
Indio, Lancaster, Palmdale, and Paso Robles have all adopted
moratoria on multi-family housing development.  Housing
advocates believe that such moratoria make it impossible for
communities to meet their overwhelming need for affordable
housing."

Current law permits temporary development moratoria for a period
of up to two years with a four-fifths vote of the local
governing body.  Government Code Section 65658 was amended in
1997 to require that the governing body make legislative
findings in support of any building moratoria.  Prior to that,
they were required to make findings.  Current law requires that
the findings in support of a moratorium demonstrate a current
and immediate threat to public health, safety or welfare.

There is concern by housing advocates that those amendments,
effective beginning in 1998, now makes it easier for local
governments to block certain development perceived to be
undesirable, e.g., low income housing.

The League of California Cities and California State Association
of Counties (CSAC) have responded by saying that the proposed
language is "over kill and would result in a significant loss of
local flexibility to adopt interim ordinances to respond to
unique local land use issues."

    Staff Comments

The interests to be balanced are the interests of local
government to place a moratorium on development of a certain
kind, to determine potential and possibly unexpected impacts vs.
the interests that affordable housing be built and not denied
due to "NIMBY" pressure.

The sponsors argue that, in essence, this bill returns to the
pre-1997 law, with respect to approval of multifamily housing
projects.  Opponents argue that it does more than that with the
qualifying language. The opponents assert that it is too onerous
on local government to require that they make written findings

--------------------------
<1> Gottheim, Joshua C., "Killer Zoning: The Moratorium Power",
California State Bar Real Property Journal, 1999.

                                                    SB 1098
                                                    Page D
which establish a specific adverse impact, which means a
"significant, quantifiable, direct, and unavoidable impact,
based on objective, identified written public health or safety
standards, policies, or conditions as they existed on the date
that the ordinance is adopted by the legislative body."

The sponsors have offered amendments to this bill to maintain
existing law for a moratorium that lasts for 45 days or less.
Under the amended version, this bill would require the
additional findings for an ordinance that lasts longer than 45
days.  The amendments also clarify that for any demolition or
conversion of affordable housing, the existing rules for
moratorium ordinances are unaffected.

    Housing Element

Existing zoning law requires a local government to identify and
appropriately zone sufficient land to meet the jurisdiction's
housing needs.  The zoning must also be accompanied by
appropriate standards to facilitate the development of housing
for families of moderate income.  Moderate-income families are
those that earn less than 120% of the area median income.

SB 1098 would clarify that a local government must identify and
appropriately zone sufficient land to meet jurisdiction's
housing needs for all income categories and assure that the
zoning is accompanied by appropriate standards to facilitate the
development of housing for lower income as well as moderate
income households.  Lower income households are those that earn
less than 80% of the area median income.

Prior Legislation

Last session SB 1621 (Alarcon) 2000, sought to add the
additional findings, enumerated in this bill, for any moratorium
ordinance that denies approval of development of multifamily
housing.
That bill was approved by the Legislature and vetoed by the
Governor.  In his veto message the Governor stated:

"Providing more housing is a critical need.  I am
reluctant, however, to use the coercive
power of state government to further impinge on the rights
of local communities to make their own best decisions on
land use matters.

SB 1098
Page E

In this year's budget, I have provided $500 million for
additional single and multi-family housing.  Included in
that amount is a $100 million incentive fund to facilitate
the construction of new affordable housing."

The committee may wish to take into consideration that this
year's budget will not contain the incentives for housing as
were provided last year.

Double referred   :  The Assembly Committee on Rules double
referred SB 1098 to Housing and Community Development Committee
and Local Government Committee.  If SB 1098 passes this
committee, the bill must be referred to the Assembly Committee
on Local Government.

REGISTERED SUPPORT / OPPOSITION  :

Support

California Apartment Association (Co-Sponsor)
California Rural Legal Assistance (Co-Sponsor)
Western Center on Law and Poverty (Co-Sponsor)
A Community of Friends, Los Angeles
AARP
Asian Law Alliance, San Jose
Barbara Sanders and Associates, Oakland
Burbank Housing Development Corporation, Santa Rosa
Cabrillo Economic Development Corporation, Saticoy
California Apartment Association
California Building Industry Association
California Chamber of Commerce
California Church Impact
California Institute for Rural Studies, Davis
California Labor Federation, AFL-CIO
California Legislative Conference of Older Americans
California Network of Neighborhood Programs
California Reinvestment Committee
California Rural Legal Assistance Foundation
California State Association of Electrical Workers
California State Pipe Trades Council
Center for Community Advocacy, Salinas
Century Housing Corporation, Culver City
Chicano Consortium, Sacramento
Chico Housing Improvement Program

SB 1098
Page F

Children Now
Children's Advocacy Institute
CHISPA, Salinas
City Heights Community Development Corporation, San Diego
Civic Center Barrio Housing Corporation, Santa Ana
Clearinghouse CDFI, Lake Forest
Coachella Valley Housing Coalition, Indio
Coalition for Economic Survival, Los Angeles
Community Housing Opportunities Corporation, Davis
Community Resource Associates, Clayton
Congress of California Seniors

Council of Churches of Santa Clara County
Council of Community Housing Organizations, San Francisco
Daniel P. Lopez and Associates, San Leandro
East Bay Asian Local Development Corporation, Oakland
East Bay Community Law Center, Oakland
Ecumenical Association for Housing, San Rafael
Eden Housing, Hayward
Enterprise Foundation, Los Angeles
Esperanza Community Housing Corporation, Los Angeles
Fair Housing Council of San Diego
Fair Housing Foundation of Long Beach
First Community Housing, Inc., San Jose
Friends Committee on Legislation of California
Friends of the Homeless, Santa Rosa
General Assistance Advocacy Project, San Francisco
Goldfarb and Lipman, Attorneys, Oakland
Great Northern Corporation, Weed
Gubb and Barshay, LLP, San Francisco
Harbor Interfaith Shelter, San Pedro
HIV Advocacy Coalition, Southern California Branch
Hollywood Community Housing Corporation
Homeward Bound, San Rafael
Housing Authority of the County of Alameda and Santa Clara
Housing Policy Network, Los Angeles
Independent Living Resources, Concord
Inglewood Neighborhood Housing Services
Interfaith Coalition for Social Justice, Orange
Jericho: A Voice for Justice
JRT and Associates, Sausalito
Kennedy Commission, Lake Forest
La Raza Centro Legal, Inc., San Francisco
Legal Aid of Santa Barbara County
Loaves and Fishes, Sacramento
Los Angeles Housing Partnership

SB 1098
Page G

Low Income Housing Fund, Oakland
Lutheran Office of Public Policy - California
Many Mansions, Thousand Oaks
Metropolitan Area Advisory Committee on Anti-Poverty
Mexican American Legal Defense and Educational Fund
Mental Health Advocacy Services, Los Angeles
Mid-Peninsula Housing Coalition, Redwood City
Napa Valley Community Housing
National Farm Workers Service Center, Los Angeles
Neighborhood House Association, San Diego
Nevada Co Housing Development, Nevada City
New Faze Development, Inc., Sacramento
Older Women's League
Orange Cares, Orange
Orange County Community Housing Corporation, Santa Ana
Pajaro Valley Housing Corporation, Watsonville
Partnership for Responsible Public Policy, Costa Mesa
People?s Self-Help Housing Corporation, San Luis Obispo
Planning for Elders in Central City, San Francisco
Preservation Properties, Santa Monica
Project New Hope, Los Angeles
Protection and Advocacy
Related Companies of California, Irvine
Renee Franken Associates, Sacramento
Rubicon Programs, Inc., Richmond
Rural California Housing Corporation, Sacramento
Rural Communities Housing Development Corporation, Ukiah
Sacramento Gray Panthers
Sacramento Housing Alliance
Sacramento Mutual Housing Association
Sacramento Neighborhood Housing Services
Santa Clara County Housing Action Coalition
Santa Cruz Community Counseling Center
Santa Monica Commission on Older Americans
Scotts Valley Band of Pomo Indians, Lakeport
Self-Help Enterprises, Visalia
Senior Housing Action Collaborative, San Francisco
Sentinel Fair Housing, Oakland
Shelter Network of San Mateo County
Shelter Partnership, Inc., Los Angeles
Shelter, Inc., Concord
Sister of Saint Joseph, Orange
Sisters of Saint Josephs of Carondelet, Los Angeles
Skid Row Housing Trust, Los Angeles
South County Housing, Gilroy

SB 1098

_____ Page H

Southern CA Association of Non-Profit Housing
St Joseph's Health System, Santa Ana
St. Peter?s Housing Committee, San Francisco
Southern California Housing Development Corporation, Rancho
Cucamonga
State Building and Construction Trades Council
Tenderloin Housing Clinic, San Francisco
The Agora Group, Goleta
Transitional Living and Support, Sacramento
Unitarian Universalist Fellowship, Laguna Beach
USA Properties, Sacramento
Venice Community Housing
West Contra Costa Conservation League, El Cerrito
West Hollywood Community Housing Corp
Western Center on Law and Poverty
Western States Council of Sheet Metal Workers
Westside Fair Housing Council, Los Angeles
WNC Associates, Costa Mesa


 Opposition

Association of California School Administrators
California State Association of Counties
City of Ceritos
City of El Cajon
City of Freemont
City of Moreno Valley
City of Santa Barbara
City of Stockton
City of Windsor
League of California Cities
South Bay Cities Council of Governments

 Analysis Prepared by  :   Hubert Bower / H. & C.D. / (916)
319-2085

# EXHIBIT G

BILL ANALYSIS

_____ SB 1098
                                         Page  1

Date of Hearing:   July 11, 2001

            ASSEMBLY COMMITTEE ON LOCAL GOVERNMENT
                    Patricia Wiggins, Chair
          SB 1098 (Alarcon) - As Amended: June 28, 2001

SENATE VOTE :  31-3

SUBJECT  :  Interim ordinances; multifamily housing.

 SUMMARY  :  Seeks to prevent local governments from using interim
ordinances to block affordable multifamily housing proposals.
Specifically, this bill :

1)Prohibits a city or county, including a charter city and/or
  county, from extending beyond
45 days any interim ordinance that denies approval of
  development of multifamily housing        unless the
  legislative body makes written findings, supported by
  substantial evidence on the record, that all of the following
  exist:

     a)   Approval of the project would have a significant,
          quantifiable, direct and unavoidable adverse impact, based
          on objective, identified written local public health, or
          safety standards, policies, or conditions as they existed
          on the date that the ordinance was adopted.

     b)   The interim ordinance is necessary to avoid the adverse
          impact.

     c)   There is no feasible alternative to the interim
          ordinance to avoid the adverse impact.

2)Exempts from the above requirements any interim ordinance
  relating to demolition, conversion, redevelopment, or
  rehabilitation of affordable multifamily housing.

3)Clarifies that, in revising a housing element, a local
  government must identify and appropriately zone sufficient
  vacant land to meet the jurisdiction's housing needs for all
  income categories and assure that the zoning is accompanied by
  appropriate standards for residential development.

 EXISTING LAW  :

_____ SB 1098
                                         Page  2

1)Provides that the legislative body of a local government, in
  order to protect the public safety, health, and welfare, may
  adopt, as an urgency measure, an interim ordinance that
  prohibits any land use that is inconsistent with a
  contemplated general plan or specific plan, or zoning proposal
  that the legislative body, planning commission or planning
  department is considering.  (Government Code Section 65858)

2)Requires a four-fifths vote of the legislative body to adopt
  an interim ordinance. (Government Code Section 65858)

3)Requires such interim ordinances to sunset 45 days after
  adoption, although the local government may extend the interim
  ordinance for additional periods to a cumulative maximum
  duration of two years. (Government Code Section 65858)

4)Provides that the legislative body shall not adopt an interim
  ordinance unless the ordinance contains legislative findings
  that there is an immediate threat to the public health,
  safety, or welfare, and that the approval of a project
  otherwise consistent with the zoning ordinance would result in
  that threat to public health, safety or welfare. (Government
  Code Section 65858)

5)Requires local governments to designate and zone sufficient
  vacant land for residential use with appropriate standards, in
  relation to zoning for nonresidential use, and in relation to
          growth projections to meet housing needs as
  identified in the general plan. (Government Code Section
  65913.1)

 FISCAL EFFECT  :  None

**EXHIBIT G**

COMMENTS :

  1)Closing a loophole .  The author contends that his legislation
    approved two years ago
  [SB 948 (Alarcon), Chapter 968, Statutes of 1999) to make it
    more difficult for local governments to deny building permits
    for affordable housing has led to increasing use of interim
    ordinances to block approval of multifamily rental housing

---

SB 1098
Page  3

          that local governments otherwise would have no legal authority
          to deny.  SB 1098 seeks to close the loophole by making it
          more difficult for local governments to adopt such interim
          ordinances.  Based on information provided by the League of
          California Cities and the sponsors, California Rural Legal
          Assistance Foundation, California Apartment Association and
          Western Center on Law and Poverty, at least 14 cities (Colma,
          Fontana, Fullerton, Indio, Lake Elsinore, Lancaster, Long
          Beach, Monte Sereno, Oakley, Orland, Palmdale, Paso Robles,
          Reedley and Upland)
        have adopted interim ordinances in the past five years that
        affect, or have affected, multifamily housing.

  2)Requiring "substantial evidence" for local legislative actions
    would set precedent.
        SB 1098's key provisions require a local government to make
          legislative findings based on "substantial evidence on the
          record" prior to adopting an interim ordinance that affects
          multifamily development.  California land use law apparently
          has never required the showing of substantial evidence for
          local  legislative  actions (such as the adoption of interim
          ordinances), although such evidence has been required for
           administrative  actions (such as approving or disapproving a
          specific project).  Court review of local  legislative  actions
          is limited to determining whether the decision was "arbitrary,
          capricious, entirely lacking in evidentiary support, or
          unlawfully or procedurally unfair" (Curtin, Jr., Daniel J.,
          Curtin's California Land Use and Planning Law, 2000 - 20th
          Edition, p. 322).

        SB 1098 also requires that findings show that the "continued
          approval of the development of multifamily housing projects
          would have a specific, adverse impact upon the public health
          or safety.  As used in this paragraph, a 'specific, adverse
          impact' means a significant, quantifiable, direct and
          unavoidable impact based on objective, identified written
          public
        health or safety standards, policies or conditions as they
          existed on the date that the ordinance is adopted by the
          legislative body."  This provision would require, in effect,
          substantial evidence in the legislative findings, even if the
          phrase "substantial evidence on the record" was not in the
          bill.  The committee may wish to consider whether the problem
          that this bill seeks to address justifies establishing a
          precedent where local  legislative  actions would be based on

---

SB 1098
Page  4

        substantial evidence.

  3)Bill not targeted to affordable multifamily housing .  Interim
    ordinances cover a range of local planning issues that usually
    do not affect multifamily housing. A survey conducted last
          year by the League of California Cities found that, of 252
          cities responding, 147 cities had adopted an interim ordinance
          in the past five years.  Topics of the interim ordinances
          ranged from pawn shops, swap meets, fast food restaurants,
          building height, adult-oriented businesses, antenna siting,
          signage, and others.  Ten of the cities reported adopting
          interim ordinances that focused on multifamily housing.  While
          it is the sponsors' intent to prevent local governments from
          unfairly stopping affordable housing projects, the bill would
          apply to any interim ordinance that "has the effect of denying
          approvals needed for the development of  all or any  multifamily
          housing projects" (emphasis added).  Thus, for example, the
          bill could prevent a small city from adopting an interim
          ordinance to delay adoption of a proposal for a large,
          market-rate multifamily project not contemplated by the
          general plan; or encourage a developer to add a token amount
          of multifamily housing to a large single-family or commercial
          project as a way to prevent the local government from adopting
          an interim ordinance to delay approval of the project.  The
          committee may wish to narrow the bill's focus to the problem

cited by the sponsors (affordable multifamily housing),
particularly if the committee agrees to allow the bill to
establish a precedent that local legislative actions be based
on substantial evidence.  The definition of "affordable" can
be based on language from SB 948 (Alarcon), Chapter 968.
Statutes of 1999.

 SUGGESTED AMENDMENTS  :

On page 2, lines 33-34, strikeout "all or any multifamily
projects" and insert:

proposed projects that predominantly consist of multifamily
housing affordable to very low-, low- or moderate income
households

_____ On page 3, after line 35, insert:

(h) The following definitions apply for the purposes of this
section:

---

                                          SB 1098
_____ Page  5

(1)    "Proposed projects that predominantly consist
of multifamily housing" means projects in which
multifamily housing consists of at least 75 percent of
the total square footage of the project, or, in the
case of a mixed-use project, at least 50 percent of
the square footage of the project.

(2)    ''Affordable to very low, low-, or
moderate-income households'' means that either (A) at
least 20 percent of the total units shall be sold or
rented to lower income households, as defined in
Section 50079.5 of the Health and Safety Code, or (B)
100 percent of the units shall be sold or rented to
moderate-income households as defined in Section 50093
of the Health and Safety Code.  Housing units targeted
for lower income households shall be made available at
a monthly housing cost that does not exceed 30 percent
of 60 percent of area median income with adjustments
for household size made in accordance with the
adjustment factors on which the lower income
eligibility limits are based. Housing units targeted
for persons and families of moderate income shall be
made available at a monthly housing cost that does not
exceed 30 percent of 100 percent of area median income
with adjustments for household size made in accordance
with the adjustment factors on which the moderate
income eligibility limits are based.

(3)    ''Area median income'' shall mean area median
income as periodically established by the Department
of Housing and Community Development pursuant to
Section 50093 of the Health and Safety Code.

  1)Part of legislative findings appears contradictory to purpose
_____ of interim ordinances.   SB 1098 would require that the
legislative body find that "the continued approval of the
development of multifamily housing projects would have a
specific, adverse impact upon the public health or safety.  As
used in this paragraph, a 'specific, adverse impact' means a
significant, quantifiable, direct and  unavoidable  impact"
(emphasis added).  The same findings requirement is contained
in SB 948 of 1999, pertaining to local government denials of
affordable housing proposals.  In the case of SB 1098,
however, the requirement that the specific, adverse impact be

---

                                          SB 1098
_____ Page  6

"unavoidable" appears contradictory to the purpose of an
interim ordinance, which is adopted by a local government
precisely to mitigate or  avoid  adverse conditions
(acknowledged by paragraph (2) beginning on line 5, page 3 of
the bill).

 SUGGESTED AMENDMENT  : On page 3, lines 1 and 2, strike out
"direct, and unavoidable" and insert:

and direct

  2)Similar bill vetoed last year.   Last session a bill similar to
SB 1098 (SB 1621, Alarcon, 2000) was approved by the

Legislature and vetoed by the Governor.  In his veto message
the Governor stated: "Providing more housing is a critical
need.  I am reluctant, however, to use the coercive power of
state government to further impinge on the rights of local
communities to make their own best decisions on land use
matters.  In this year's budget, I have provided $500 million
for additional single and multi-family housing.  Included in
that amount is a $100 million incentive fund to facilitate the
construction of new affordable housing."

  3)TECHNICAL AMENDMENTS  .  For consistency, the committee may wish
    to adopt the following technical amendments:

On page 2, line 40, strike out "or safety" and insert: "safety
  or welfare"

On page 3, line 6, after "the" insert: "specific,"

On page 3, line 9, after "the" insert: "specific,"

  4)This bill has been double-referred to both the Assembly
    Committees on Housing and Community Development, where it
    passed with a  6-3 vote on June 27, 2001, and to Local
    Government.


_____  REGISTERED SUPPORT / OPPOSITION  :

  Support

CA Apartment Association [CO-SPONSOR]


---

CA Rural Legal Assistance [CO-SPONSOR]
Western Center on Law and Poverty [CO-SPONSOR]
A Community of Friends, Los Angeles
AARP
Asian Law Alliance, San Jose
Barbara Sanders and Associates, Oakland
Burbank Housing Development Corporation, Santa Rosa
Cabrillo Economic Development Corporation, Saticoy
CA Apartment Association
CA Building Industry Association
CA Chamber of Commerce
CA Church Impact
CA Institute for Rural Studies, Davis
CA Labor Federation, AFL-CIO
CA Legislative Conference of Older Americans
CA Network of Neighborhood Programs
CA Reinvestment Committee
CA Rural Legal Assistance Foundation
CA State Association of Electrical Workers
CA State Pipe Trades Council
Center for Community Advocacy, Salinas
Century Housing Corporation, Culver City
Chicano Consortium, Sacramento
Chico Housing Improvement Program
Children Now
Children's Advocacy Institute
CHISPA, Salinas
City Heights Community Development Corporation, San Diego
Civic Center Barrio Housing Corporation, Santa Ana
Clearinghouse CDFI, Lake Forest
Coachella Valley Housing Coalition, Indio
Coalition for Economic Survival, Los Angeles
Community Housing Opportunities Corporation, Davis
Community Resource Associates, Clayton
Congress of California Seniors
Council of Churches of Santa Clara County
Council of Community Housing Organizations, San Francisco
Daniel P. Lopez and Associates, San Leandro
East Bay Asian Local Development Corporation, Oakland
East Bay Community Law Center, Oakland
Ecumenical Association for Housing, San Rafael


  Support (continued)


---

Eden Housing, Hayward
Enterprise Foundation, Los Angeles
Esperanza Community Housing Corporation, Los Angeles
Fair Housing Council of San Diego
Fair Housing Foundation of Long Beach
First Community Housing, Inc., San Jose
Friends Committee on Legislation of California
Friends of the Homeless, Santa Rosa
General Assistance Advocacy Project, San Francisco
Goldfarb and Lipman, Attorneys, Oakland
Great Northern Corporation, Weed
Gubb and Barshay, LLP, San Francisco
Harbor Interfaith Shelter, San Pedro
HIV Advocacy Coalition, Southern California Branch
Hollywood Community Housing Corporation
Homeward Bound, San Rafael
Housing Authority of the County of Alameda and Santa Clara
Housing Policy Network, Los Angeles
Independent Living Resources, Concord
Inglewood Neighborhood Housing Services
Interfaith Coalition for Social Justice, Orange
JERICHO: A Voice for Justice
JRT and Associates, Sausalito
Kennedy Commission, Lake Forest
La Raza Centro Legal, Inc., San Francisco
Legal Aid of Santa Barbara County
Loaves and Fishes, Sacramento
Los Angeles Housing Partnership
Low Income Housing Fund, Oakland
Lutheran Office of Public Policy - California
Many Mansions, Thousand Oaks
Metropolitan Area Advisory Committee on Anti-Poverty
Mexican American Legal Defense and Educational Fund
Mental Health Advocacy Services, Los Angeles
Mid-Peninsula Housing Coalition, Redwood City
Napa Valley Community Housing
National Farm Workers Service Center, Los Angeles
Neighborhood House Association, San Diego
Nevada Co Housing Development, Nevada City
New Faze Development, Inc., Sacramento
Older Women's League
Orange Cares, Orange
Orange County Community Housing Corporation, Santa Ana
Pajaro Valley Housing Corporation, Watsonville

Partnership for Responsible Public Policy, Costa Mesa
Preservation Properties, Santa Monica

Support (continued)

People's Self-Help Housing Corporation, San Luis Obispo
Planning for Elders in Central City, San Francisco
Project New Hope, Los Angeles
Protection and Advocacy
Related Companies of California, Irvine
Renee Franken Associates, Sacramento
Rubicon Programs, Inc., Richmond
Rural California Housing Corporation, Sacramento
Rural Communities Housing Development Corporation, Ukiah
Sacramento Gray Panthers
Sacramento Housing Alliance
Sacramento Mutual Housing Association
Sacramento Neighborhood Housing Services
Santa Clara County Housing Action Coalition
Santa Cruz Community Counseling Center
Santa Monica Commission on Older Americans
Scotts Valley Band of Pomo Indians, Lakeport
Self-Help Enterprises, Visalia
Senior Housing Action Collaborative, San Francisco
Sentinel Fair Housing, Oakland
Shelter Network of San Mateo County
Shelter Partnership, Inc., Los Angeles
Shelter, Inc., Concord
Sister of Saint Joseph, Orange
Sisters of Saint Josephs of Carondelet, Los Angeles
Skid Row Housing Trust, Los Angeles
South County Housing, Gilroy
Southern CA Association of Non-Profit Housing
St Joseph's Health System, Santa Ana
St. Peter's Housing Committee, San Francisco
Southern CA Housing Development Corporation, Rancho Cucamonga
State Building and Construction Trades Council
Tenderloin Housing Clinic, San Francisco
The Agora Group, Goleta
Transitional Living and Support, Sacramento
Unitarian Universalist Fellowship, Laguna Beach
USA Properties, Sacramento
Venice Community Housing
West Contra Costa Conservation League, El Cerrito
West Hollywood Community Housing Corp

SB 1098
Page  10

Western Center on Law and Poverty
Western States Council of Sheet Metal Workers
Westside Fair Housing Council, Los Angeles
WNC Associates, Costa Mesa


 Opposition

Association of CA School Administrators
CA State Association of Counties
Cities of:  Cerritos, El Cajon, Fremont, Moreno Valley, Santa
Barbara, Stockton, Windsor
League of CA Cities
South Bay Cities Council of Governments


 Analysis Prepared by  :    Dan Flynn / L. GOV. / (916) 319-3958

# EXHIBIT H

SB 1098
Page A

SENATE THIRD READING
SB 1098 (Alarcon)
As Amended June 28, 2001
Majority vote

SENATE VOTE :31-3

HOUSING           6-3       LOCAL GOVERNMENT    7-4

```
------------------------------------------------------
|Ayes:|Lowenthal, Cohn, Dutra, |Ayes:|Wiggins, Salinas,     |
|     |Kehoe, Salinas, Wayne   |     |Canciamilla, Correa,  |
|     |                        |     |Diaz, Lowenthal, Negrete|
|     |                        |     |McLeod                |
|-----+------------------------+-----+----------------------|
|Nays:|Mountjoy, Cogdill, Runner|Nays:|Cogdill, Daucher, Harman,|
|     |                        |     |LaSuer                |
------------------------------------------------------
```

 SUMMARY : Makes changes in law relating to interim ordinances
and housing element law. Specifically, this bill :

1)Prohibits a city or county, including a charter city and/or
  county from extending beyond 45 days, any interim ordinance
  that denies approval of projects that include at least
  one-third of the total square footage of the project for
  multifamily housing, unless the legislative body makes written
  findings, supported by substantial evidence, that all of
  following exist:

   a)   Approval of the project would have a significant,
        quantifiable, direct and unavoidable adverse impact, based
        on objective, identified written public health, or safety
        standards, policies, or conditions as they existed on the
        date that the ordinance was adopted;

   b)   The interim ordinance is necessary to avoid the adverse
        impact; and,

   c)   There is no feasible alternative to avoid the adverse
        impact.

2)Clarifies that existing law still applies to a moratorium
  ordinance relating to demolition, conversion, redevelopment,
  or rehabilitation of affordable multifamily housing.

SB 1098
Page B

3)Clarifies that local governments must identify and
  appropriately zone sufficient land to meet the jurisdiction's
  housing needs for all income categories and assure that the
  zoning is accompanied by appropriate standards to facilitate
  the development of housing for lower income as well as
  moderate income households.

 FISCAL EFFECT : None

 COMMENTS :

 1) Interim Ordinances/Moratorium Power : The Moratorium Power
  allows a local government to adopt a development "freeze" or
  other zone change immediately, without following normal
  rezoning procedures such as preparing an Environmental Impact
  Report, noticing and holding a public hearing, adopting an
  ordinance over two meetings at least five days apart, and
  allowing thirty days before the ordinance goes into effect.  A
  developer making application one day under one set of zoning
  regulations may find that the next day the rules have changed.
   It has been suggested that the Moratorium Power may be used
  as a trump card against politically "undesirable" land uses,
  such as low-income housing.

Based on information provided by the League of California Cities
and the sponsors, California Rural Legal Assistance
Foundation, California Apartment Association and Western
Center on Law and Poverty, at least 14 cities (Colma, Fontana,
Fullerton, Indio, Lake Elsinore, Lancaster, Long Beach, Monte
Sereno, Oakley, Orland, Palmdale, Paso Robles, Reedley and
Upland) have adopted interim ordinances in the past five years
that affect, or have affected,  multifamily housing.

Current law permits temporary development moratoria for a period
of up to two years with a four-fifths vote of the local
governing body.  Government Code Section 65658 was amended in
1997 to require that the governing body make legislative

**EXHIBIT H**

findings in support of any building moratoria.  Prior to that,
they were required to make findings. Current law requires that
the findings in support of a moratorium demonstrate a current
and immediate threat to public health, safety or welfare.

There is concern by housing advocates that those amendments,
effective beginning in 1998, now makes it easier for local
governments to block certain development perceived to be

                                                        SB 1098
                                                       Page C
_____
undesirable, e.g., low income housing.

Amendments taken in Assembly Local Government Committee clarify
that the limitations placed on local governments in passing
interim ordinances apply only to those developments with a
significant component of multifamily housing.  The League of
Cities raised a concern that a developer could have a large
project that is nearly all single family homes and include one
duplex to trigger this exception.  Thus the bill was amended
to require that at least one-third of the square footage of
the project must be multifamily housing to trigger the
limitation on moratorium power.

 2)Housing Element  :  Existing zoning law requires a local
government to identify and appropriately zone sufficient land
to meet the jurisdiction's housing needs.  The zoning must
also be accompanied by appropriate standards to facilitate the
development of housing for families of moderate income.
Moderate-income families are those that earn less than 120% of
the area median income.

SB 1098 would clarify that a local government must identify and
appropriately zone sufficient land to meet jurisdiction's
housing needs for all income categories and assure that the
zoning is accompanied by appropriate standards to facilitate
the development of housing for lower income as well as
moderate income households.  Lower income households are those
that earn less than 80% of the area median income.

 Analysis Prepared by  :  Hubert Bower / H. & C.D. / (916) 319-2085

                                    FN: 0002566